**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-0005 (RDM)** |
| **v.** | : | |
| | : | |
| **COREY HORAN,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The defendant pled guilty to one count of 18 U.S.C. § 1752(a)(1). For the reasons set forth herein, the government requests that this Court sentence Defendant Corey Horan to 21 days of incarceration. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I. Introduction

Defendant Corey Horan is 50 years old and works as an electrician at the University of California at San Diego. Horan participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Horan pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by his entry into the Capitol building with his minor son, remaining on the grounds for a prolonged period of time, and minimization and celebration of the events of January 6, 2021.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Horan's crime support a sentence of 21 days of incarceration, 60 hours of community service and $500.00 restitution.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF24.

### Defendant Horan's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Horan flew from San Diego, California to Dulles Airport in Virginia with his 14-year-old son. Other members of his family also traveled to Washington, D.C. on January 6, 2021. On January 5, 2021 at approximately 12:07 p.m. (EST), Horan's brother Sean texted in a group chat "I'm officially boarded the . . . plane Boys heading to defend the republic" and "Oh yeah let's goooooo[.]" Approximately one minute later, Horan responded "Giddy up JB!!! Let's do this!!!" At approximately 12:10 p.m. (EST), Sean texted "Seeing a whole lot of MAGA

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hats on this flight! The Patriots are coming !!" Horan responded approximately one minute later "That's awesome!!"

On the morning of January 6, 2021, Horan attended the Stop the Steal rally at the Ellipse with his brother, niece, son, and family friend. Then following the rally, Horan, his son, and other group members walked toward the Capitol grounds from the west side of the building. They passed a person with a microphone and loudspeaker who said "Continue, we outnumber them!" As pictured below in Image 1, Horan looked toward the speaker who said "We the People have spoken and this election was a fraud! . . . We are not going to let mainstream media decide who our President is, continue forward!" After the defendant passed the speaker with his son, but while he was still in view, the speaker said "Hey guys, just know we do not want any children up there. This is only for adults!"



***Image 1: Horan (circled in red) in crowd near speaker***

Horan and his son continued toward the Capitol building, moving onto the West Front. As pictured below in Image 2, Horan and his son were among a dense crowd of people positioned on the West lawn, before they ascended to the Upper West Terrace.



*Image 2: Horan and his son in the crowd on the West front*

By the time Horan and his son made it to the Upper West Terrace, rioters had already smashed both windows surrounding the Senate Wing Door. Police had barricaded the window to the right of the Senate Wing Door. As pictured below in Image 3, Horan stood next to a short wall on the Upper West Terrace directly in front of the Senate Wing Door, approximately where the red "X" is located on Image 4. A line of police officers in riot gear and neon jackets stood approximately where the blue "Xs" are on Image 4.



*Image 3: Horan on Upper West Terrace*



*Image 4: Rendering of the Upper West Terrace with approximate positions of Horan (red x)*
*and Law Enforcement (blue x's)*

As pictured below in Image 5, Horan looked into the entrance of the Senate Wing Door while his son appeared to record or photograph on his cell phone. At that moment, the video associated with Image 3 shows that a loud, continuous alarm was blaring.



*Image 5: Horan (circled in red) looks inside while Horan's son (noted with a blue arrow) holds up his phone and appears to record or photograph the Senate Wing Door entrance*

Horan entered the Capitol building with his son through the Senate Wing Door at approximately 3:23 p.m., as pictured below in Image 6. At that time, several police officers outfitted in helmets and other riot gear stood in the entryway. Horan remained in the hallway by the door as shown in Image 7, and then exited the building through the same door at approximately 3:26 p.m., as shown in Image 8.



***Image 6: CCTV still of Horan (circled in red) and his son (noted with blue arrow) inside the Capitol***

While Horan was inside the Capitol building, he appeared to briefly interact with an officer outfitted in a riot helmet after being inside for approximately one minute. Horan doesn't immediately leave after this interaction, but rather took out a cell phone and appeared to film or photograph the broken window next to the Senate Wing Door. Horan returned to the crowd away from the broken window and appeared to briefly interact with an officer in riot gear a second time after having been in the Capitol for around two minutes. Horan and his son then begin making their way to the Senate Wing Door and exit after nearly three minutes inside.



*Image 7: CCTV still of Horan (circled in red) and his son (noted with blue arrow) at broken window near Senate Wing Door*



*Image 8: CCTV Still of Horan (circled in red) and his son (noted with blue arrow) leaving the U.S. Capitol building*

After exiting the Capitol building, Horan and his son traveled Northeast around the building on the terrace near the North Doors. Rioters continued to battle police in this area and attempt to breach the North Doors from around 3:30 p.m. until a large force of officers pushed rioters en masse from the area at around 4:30 p.m. The crowd used bike racks to attack police and chemical irritants were deployed in the area as pictured below in Image 9.



***Image 9: Police battle with rioters at the North Doors***

Around 4:14 p.m., an officer was pulled into the crowd by rioters and several officers rushed into the crowd after him and more chemical irritants were deployed as shown in Images 10 and 11.



***Image 10: Officers (circled in red) in the crowd with rioters***



***Image 11: Chemical irritants deployed into the crowd as police retreat***

Horan and his son were nearby around this time and likely observed many of the events

at the North Doors. As the person who filmed the source video for Images 9-11 retreated from

the North Doors, and physically reacted to the chemical irritants being deployed, Horan and his

son are captured on video looking towards the action as shown below in Image 12.



*Image 12: Horan and his son (circled in red) looking towards the North Doors*

Horan even pulled up his neck gaiter, presumably to withstand the chemical

irritants in the air as pictured below in Image 13.



*Image 13: Horan (circled in red) and his son near the North Doors*

At approximately 1:20 p.m. on January 6, Horan texted "Billy From DC Rally" that "We're gonna try and catch up with you guys in a bit[.]" At about 5:37 p.m., Horan texted the same person "It was great meeting you guys brother! Be safe. The day may come where we all need to link up and fight but for now it's time for a few beers." Then at 5:40 p.m., Horan again texted the same person "We ended up getting into the capital for a bit. Crazy freaking day man[.]" At approximately 6:06 p.m., "Billy from DC Rally" texted Horan and wrote "Dude U GUYS ARE FREAKIN AWESOMENESS!!!!! What a day… HISTORY BABY… PLEASE KEEP IN TOUCH[.]" Horan responded "Man wild freakin day! Definitely wasn't thinking we'd come to DC and do this shit huh?" On the evening of January 6, 2021, the defendant shared a photo in the same family group chat previously described. The photograph was of rioters inside the U.S. Capitol and he wrote "This was a pic from today. Aren't the 2 on the left known Antifa members? And the dude on the right looks like one of them[.]" Sean responded "Yeah those aren't MAGA at all[.]"

On January 7, 2021, "Billy from DC Rally" texted Horan "Everything on the news is nuts we made history glad we're all safe sad for the people who died but I think we all needed to be there the president called for us and we showed up we answered the call[.]" Horan responded "Amen brother! We made history. Talk with you soon[.]" On January 8, 2024 at approximately 12:24 a.m. (EST), Horan wrote to his family group chat "What a day yesterday! We'll be telling our grandkids about it." On January 12, 2021 at approximately 8:20 p.m. (EST), Horan texted "Billy from DC Rally" that "I forget your friend name but he had the plate carrier on and said his friend makes plates and I was wondering if you know what the company name is? I'm looking to get some plates for my vest."

*Defendant's Interview*

Horan was arrested on August 8, 2023 in the Southern District of California. FBI Agents interviewed Horan after his arrest, and Horan stated that he learned about the rally in Washington, D.C. on January 6, 2021 at a "boat rally" in San Diego in support of Donald Trump. Horan said that he went to Washington, D.C. with two of his brothers, his son, niece, and a family friend. Horan told the FBI that he couldn't remember the name of his hotel, but that it was within walking distance to the speeches. Horan and his family walked to the Ellipse and watched the speeches there for about 2-3 hours. Despite listening to the speeches, Horan denied knowing about the counting of the electoral college votes or Congress' presence inside the Capitol on January 6.  After listening to the speeches, Horan stated that he and his family returned to their hotel to warm up and have something to eat. While at their hotel, Horan said that they saw people walking toward the Capitol chanting, so Horan and his family joined the crowd and walked down a road toward the Capitol building.

Once at the Capitol, Horan said that the grounds were very crowded and denied seeing any signs or fencing before entering the grounds. Horan stated that he first saw a group of 8-10 rioters wearing tactical gear and "plate carrier" vests after leaving the Capitol, and that he thought that was strange. This claim appears inconsistent with the text messages above in which Horan asks about a plate carrier vest worn by a friend of "Billy from DC Rally." Based on the texts, it seems Horan met "Billy from DC Rally" at the Ellipse and texted him about "catching up" at approximately 1:20 p.m. – more than two hours before Horan went inside the Capitol.

Horan recalled walking up the stairs near the scaffolding to the Upper West Terrace area and admitted to entering the Capitol for a few minutes with his son. Despite entering though the Senate Wing Door with a crowd of people, while an alarm was blaring, and the window was

smashed, Horan denied knowing the Capitol was restricted on January 6. Horan stated he thought he could tour the Capitol building and felt naïve for bringing his son into that situation. Of course, no legitimate tour begins at a broken-open fire door where an alarm is blaring. Shortly after entering the building, Horan realized that the officers inside seemed "uneasy" and "stressed." Horan stated that he realized the police were dealing with a large crowd and that he approached an officer to say "sorry that you have to deal with this," then he left the building with his son. While Horan does appear to briefly interact with an officer outfitted in a riot helmet after being in the building for approximately one minute, he doesn't immediately leave after this interaction. Instead, Horan takes out a cell phone and appears to film or photograph the broken window next to the Senate Wing Door. Horan walks up to that window and then returns to the crowd away from the broken window. Horan appeared to briefly interact with an officer in riot gear a second time after having been in the Capitol for around two minutes. Horan and his son then begin making their way to the Senate Wing Door and exit after nearly three minutes inside.

Horan did not recall how long he stayed on the grounds after leaving the building; however, he admitted that it was dark by the time he returned to his hotel. He reasoned that he may have stayed on Capitol grounds for a while after exiting the building.  Horan turned on the news at his hotel and thought the events being captured were not anything like what his experience was; he thought the news might be spinning a narrative. Horan described his experience at the Capitol as an "amazing, crazy day."

On March 19, 2024, Horan was interviewed by Probation. In the interview, Horan expressed remorse for his actions on January 6, 2021 including his decision to bring his son to the Capitol building. PSR ¶ 32. To his credit, Horan stated that he is trying to be a good role model to his son by accepting responsibility. PSR ¶ 33. However, Horan seeks to minimize his conduct once

more by claiming – incredibly – he was "pushed up the Capitol stairs by the crowd."  PSR ¶ 30. This statement suggests that Horan could not have refrained from going to the Upper West Terrace. Further, there is no evidence that supports he was pushed into the building against his will or somehow prevented from immediately leaving the grounds when he realized something was amiss. Horan recalled smelling tear gas, hearing alarms, and seeing a distressed police officer. PSR ¶ 30. After this though, he remained on Capitol grounds for at least 45 minutes or so and was in an area where rioters continued to battle police, yet Horan stated that he did not learn the extent of what happened on January 6 until returning to his hotel that evening. PSR ¶ 31.

*The Charges and Plea Agreement*

On January 3, 2024, the United States charged Horan by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On January 11, 2024, pursuant to a plea agreement, Horan pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III. Statutory Penalties

Horan now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 34-44.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that Section 4C1.1 applies to Horan, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances.

16

Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Horan's criminal history points as zero (e.g. category I)]. PSR at ¶ 47. Accordingly, the U.S. Probation Office calculated Horan's total adjusted offense level, after acceptance and including the reduction under 4C1.1, at two, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 42, 88.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days of incarceration, 60 hours of community service and $500.00 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Horan's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Horan, the absence of violent or destructive acts is not a mitigating factor. Had Horan engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Horan's case is the fact that he brought his minor son with him inside the Capitol, placing him in danger and exposing him to violence. This decision to involve his minor child also places Horan in rare company amongst January 6th defendants. Moreover, every person in the Capitol contributed to the disruption and delay of Congress' certification proceeding. Every person who entered the building was one more person the police had to clear out of the building. Furthermore, while inside the Capitol, Horan saw distressed officers, heard a blaring alarm and saw broken windows, yet stayed on Capitol grounds with his son for at least another 45 minutes after leaving the Capitol, in an area where rioters battled with police.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Horan's History and Characteristics

Horan is 50 years old and works as an electrician for the University of California, San Diego. He is divorced and has custody of a son from that marriage. Horan also has a daughter from his present relationship whom resides with her mother in a Northern California. Horan was arrested in 2010 for domestic violence and violation of a protective order. That same year, he was convicted of one count of violating a protective order and sentenced to 3 years of probation, 1 day jail, and a fine. In 2021, the conviction was set aside and dismissed pursuant to a petition under the California Penal Code.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Horan weighs in favor of a term of incarceration. While Horan only briefly entered the Capitol building, Horan's minimization of the events of January 6, 2021, is concerning. Despite traveling across the country from California,

20

texting in approval about going to Washington, D.C. to "defend the republic," and admitting to listening to speeches at the Ellipse for 2-3 hours, Horan claimed to have no idea that Congress was meeting in the Capitol on January 6, 2021. Horan falsely—and incredibly—told the FBI that he saw nothing violent or out of the ordinary until *after* leaving the building. This, despite his admissions that he heard an alarm, that he saw and smelled tear gas, that he saw at least one police officer in distress, that he would have seen officers severely outnumbered, and that he appears, on video, to have observed a broken window adjacent to the door through which he entered—all *before* he left the building. Even after seeing these things, Horan did not leave the Capitol grounds, but instead made his way over to the North Doors where police battled with rioters trying to breach the Capitol at that location. Rioters used bike racks to assault and interfere with police and chemical irritants were deployed. At one point, a police officer was pulled into the crowd by the rioters, all while Horan remained on Capitol grounds with his son near that location.  Horan specifically mentioned to the FBI during his interview that he saw rioters in tactical gear after he left the building. His texts, however, seem to indicate having seen someone in body armor near the Ellipse.

Even in the days after January 6, 2021, and at the time of his arrest, Horan referred to January 6, 2021 in positive terms as reflected in his text messages and interview to the FBI. For example, as previously mentioned, on the evening of January 6, Horan boasted to someone he met at the rally that he "ended up getting into the capital for a bit." This phrasing indicates that Horan put in effort to enter the Capitol and was proud of what he accomplished. The person he met at the rally responded "Dude U GUYS ARE FREAKIN AWESOMENESS!!!!! What a day… HISTORY BABY… PLEASE KEEP IN TOUCH[.]" Horan responded "Man wild freakin day! Definitely wasn't thinking we'd come to DC and do this shit huh?" The following day, the same person texted

Horan "Everything on the news is nuts we made history glad we're all safe sad for the people who died but I think we all needed to be there the president called for us and we showed up we answered the call[.]" Horan responded "Amen brother! We made history. Talk with you soon[.]" Then, on January 8, 2024, Horan wrote to his family group chat "What a day yesterday! We'll be telling our grandkids about it." Even years later, at the time of his arrest, Horan described his experience at the Capitol to the FBI as an "amazing, crazy day."

In his interview to probation, Horan has now expressed remorse, but with the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Horan in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Horan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Horan has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Heather Kepley* 23-cr-162 (BAH), the defendant pleaded guilty to one count of 18 U.S.C. § 1752(a)(1) and was sentenced to 28 days of intermittent confinement as a condition of 36 months' probation, 60 days home detention, a $1,500 fine, and $500.00 in restitution. In that case, the defendant traveled to Washington, D.C. with her brother and 15-year-old minor son and nephew. On the West Plaza, the defendant assisted rioters with moving a section of bike rack fencing to gain entry further onto the Capitol grounds. The defendant and her son were on the Lower West Terrace where they observed violence against police officers in the tunnel and suffered the effects of chemical irritants. At one point, the defendant and her son and nephew were inside the tunnel area while rioters battled police. The defendant in that case also posted on social media boasting about her actions at the Capitol and her intent to commit violence against politicians. While the defendant in that case, took a more active role in the riot as compared to Horan, they both brought their minor children into a riot despite clear signals that they were not allowed to be present. They exposed themselves, and their children, to chemical irritants and witnessing acts of violence against police. They both stayed on Capitol grounds for a significant amount of time despite seeing their children being exposed to these things.

In *United States v. Daniel Shaw* 22-cr-00001 (JEB), the defendant and his minor son traveled from California to Washington D.C. On January 6, the defendant and his minor son entered the restricted perimeter on the East side of the building and observed and heard flash bangs and tear gas on the Capitol grounds. The defendant and his minor son ascended the steps leading to the East Rotunda doors where windowpanes had been broken and police guarded the entryway. They remained on the steps outside for approximately an hour before the defendant and his minor son entered through the East Rotunda Doors at approximately 3:02 p.m. while passing shattered glass and hearing blaring alarms. The defendant and his minor son entered the Rotunda and left after police started pushing rioters out, ultimately remaining in the Capitol for approximately 14 minutes. The defendant plead guilty to one count of 40 U.S.C. § 5104(e)(2)(G) Parading, Demonstrating, and Picketing in the Capitol Building and was sentenced to 10 days of incarceration, 24 months of probation and $500.00 in restitution. Similar to Horan, the defendant brought his minor son with him into the Capitol building despite passing broken glass and a blaring alarm. Also, Horan and his son were also exposed to chemical irritants over by the North Doors, much like what the defendant in *Shaw* and his son were exposed to outside the East Rotunda Doors. Horan and his son, much like the defendant in *Shaw* and his, were on Capitol grounds for a significant amount of time despite what was going on around them.

In *United States v. Patrick O'Brien* 23-cr-00311(RDM), the defendant traveled from Montana with his minor son to Washington, D.C. After attending the rally, the defendant and his minor son went to the Capitol grounds and made their way to the Upper West Terrace. The defendant and his son entered the Capitol through the Senate Wing Door shortly after it was breached at approximately 2:26 p.m. The defendant and his son traveled to the Crypt and to the second floor, and to the main entrance of the House Speaker's office. While near the entrance to

the Senate and the Vice President's ceremonial office, the defendant observed as his minor son stole a mouse pad off of a desk. The defendant and his son ultimately left the building through the East Rotunda doors after approximately 28 minutes in the building. The defendant pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G) and your Honor sentenced him to 90 days home detention, 36 months of probation, 100 hours of community service and $500.00 in restitution. While Horan and his minor son entered the Senate Wing Door well after the initial breach and remained in the building for much less time, they remained on the grounds for a significant period of time near an area where violence against police was rampant at the North Doors.

In *United States v. Nicholas Reimler,* 21-cr-00239 (RDM), the defendant entered the same door as Horan at 3:07 p.m. and made his way to the Crypt, remaining in the Capitol for 19 minutes. Unlike Horan, there was no evidence that the defendant was present when rioters clashed with police. The defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) and was sentenced by this Court to one month of home detention, 36 months of probation, 60 hours of community service, and $500.00 restitution. While Horan was in the Capitol for less time, he brought his minor child with him and remained on Capitol grounds for a significant amount of time, despite being near violence with his son.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Horan must pay $500 in restitution, which reflects in part the role Horan played in the riot on January 6.[4] Plea Agreement at ¶ 13. As the plea agreement reflects,

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Horan's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 103.

## VII.    Fine

The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

 Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500-$9,500. U.S.S.G. § 5E1.2(c).

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days incarceration, 60 hours of community service and $500.00 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Horan's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Kyle R. Mirabelli*
KYLE R. MIRABELLI
Assistant United States Attorney
N.Y. Bar No. 5663166
601 D Street, N.W.
Washington, DC 20530
(202) 252-7884
Kyle.Mirabelli@usdoj.gov